## Nos. 23-1148 & 23-1766

# United States Court of Appeals

*for the*

# Fourth Circuit

---

STUDCO BUILDING SYSTEMS US, LLC,

*Plaintiff-Appellee,*

– v. –

1ST ADVANTAGE FEDERAL CREDIT UNION,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

## OPENING BRIEF OF APPELLANT

JOHN M. BREDEHOFT
KAUFMAN & CANOLES, P.C.
150 West Main Street, 2100
P. O. Box 3037
Norfolk, Virginia 23514
(757) 624-3000
jmbredehoft@kaufcan.com

– and –

ADAM B. PRATT
KAUFMAN & CANOLES, P.C.
4801 Courthouse Street, Suite 300
P. O. Box 6000
Williamsburg, Virginia 23188
(757) 259-3800
abpratt@kaufcan.com

*Attorneys for Defendant-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>23-1148</u>        Caption: <u>Studco Building Systems US, LLC v. 1st Advantage Federal Credit Union</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>1st Advantage Federal Credit Union</u>
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.  Does party/amicus have any parent corporations?   ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:



3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                     ☐ YES ☑ NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?      ☐ YES ☑ NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: _Adam B. Pratt_____      Date: ____2/23/2023____

Counsel for: _1st Advantage Federal Credit Union_____

[ Print to PDF for Filing ]

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

JURISDICTIONAL STATEMENT .................................................... 1

ISSUES PRESENTED FOR REVIEW ............................................... 2

STATEMENT OF THE CASE ........................................................... 4

SUMMARY OF ARGUMENT .......................................................... 10

ARGUMENT ..................................................................................... 13

      Standard of Review.......................................................................... 13

I.     THE DISTRICT COURT COMMITTED AN ERROR OF LAW BY CREATING A NEGLIGENCE STANDARD FOR LIABILITY UNDER VA. CODE § 8.4-207, WHICH IMPOSES LIABILITY ONLY WHERE THE RECEIVING FINANCIAL INSTITUTION HAD "ACTUAL KNOWLEDGE" OF MIS-DESIGNATION OF THE BENEFICIARY AT THE TIME THE TRANSACTION OCCURRED ................................................................. 13

II.    THE DISTRICT COURT COMMITTED AN ERROR OF LAW BY IMPOSING LIABILITY ON 1ST ADVANTAGE UNDER A COMMON-LAW "BAILMENT" THEORY .................. 21

      A.    Under Virginia Law, Creation of a Bailment Requires the Entrustment of Chattel; Electronic or Other Deposit of Funds in a Financial Institution Cannot Create a Bailment as a Matter of Law .................................................... 21

      B.    The Provisions of the Uniform Commercial Code, Va. Code § 8.4-207, Preempt any Virginia Common Law Cause of Action of Bailment Based on the Same Facts .......... 24

III.   TO THE EXTENT ANY LIABILITY IMPOSED ON 1ST ADVANTAGE RESTS ON A CONCLUSION THE DEFENDANT FAILED TO EXERCISE REASONABLE CARE, THE DISTRICT COURT COMMITTED LEGAL ERROR IN NOT FINDING RECOVERY BARRED BY THE DOCTRINE OF CONTRIBUTORY NEGLIGENCE .............. 27

CONCLUSION ................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*AlBritton v. Commonwealth*,
   299 Va. 392 (2021) ................................................................27

*Aufforth v. Aufforth*,
   72 Va. App. 617 (2020) ...........................................................22

*Auto. Serv. Fin., Inc. v. Affordable Towing, Inc.*,
   71 Va. Cir. 15 (Va. Beach 2006) .............................................22

*Bernardini v. Cent. Nat'l Bank*,
   223 Va. 519 (1982) ..................................................................22

*Collins v. First Union Nat'l Bank*,
   272 Va. 744 (2006) ..................................................................26

*Crandall v. Woodard*,
   206 Va. 321 (1965) ..................................................................22

*Daughtry v. Gray's Body Shop, Inc.*,
   82 Va. Cir. 366 (Norfolk 2011) ...............................................22

*Equitable Life Assurance Soc. of the U.S. v. Okey*,
   812 F.2d 906 (4th Cir. 1987) ...................................................25

*Evans v. Charles Barker Infiniti, Inc.*,
   No. 011858, 2002 WL 32784253 (Va. June 7, 2002) ...............22

*First Sec. Bank of New Mexico, N.A. v. Pan Am. Bank*,
   215 F.3d 1147 (10th Cir. 2000) ...........................................20, 21

*First State Bank of Monroe v. Connoley*,
   131 Va. 479 (1921) ..................................................................23

*Gardner v. Commonwealth*,
   262 Va. 18 (2001) ....................................................................22

*Greenbrier Hotel Corp. v. Unite Here Health*,
   Nos. 16-2116, 17-1720, 719 F. App'x. 168 (4th Cir. 2018) .............13

*K-B Corp. v. Gallagher*,
  218 Va. 381 (1977) .................................................................22

*Nirav Ingredients, Inc. v. Wells Fargo Bank, N.A.*,
  No. 21-1983, 2022 WL 3334626 (4th Cir. Aug. 12, 2022) ...................25

*Pendleton v. Commonwealth*,
  110 Va. 229 (1909) .................................................................22

*Reserve Bank v. State Bank*,
  150 Va. 423(1928) .................................................................22

*Schlegel v. Bank of America, N.A.*,
  271 Va. 542 (2006) .................................................................26

*Smith v. Va. Elec. & Power Co.*,
  204 Va. 128 (1963) .................................................................27

*Stefano v. First Union Nat'l Bank of Va.*,
  981 F. Supp. 417 (E.D. Va. 1997) ...............................................25

*Tatum v. RJR Pension Inv. Comm.*,
  761 F.3d 346 (4th Cir. 2014) .....................................................13

*Wallace ex rel. DMT, LLC v. Truist Bank*,
  No. 21-2380, 2022 WL 2452355 (4th Cir. July 6, 2022) ...................25

**Statutes and Other Authorities:**

18 U.S.C. § 1961 ........................................................................1

28 U.S.C. § 1291 ........................................................................1

28 U.S.C. § 1331 ........................................................................1

28 U.S.C. § 1332 ........................................................................1

12 C.F.R. § 1016.10(a)(1) ............................................................9

Fed. R. Civ. P. 4(a)(1)(A) ............................................................2

Fed. R. Civ. P. 4(a)(2) .................................................................2

Fed. R. Civ. P. 36 .....................................................................29

Fed. R. Civ. P. 58(e) ...................................................................2

Fed. R. Civ. P. 59(e) ........................................................................................ 2

U.C.C. Article 4 .............................................................................................. 26

U.C.C. Article 4A ............................................................................................ 25

Va. Code § 8.1A-103 ....................................................................................... 26

Va. Code § 8.1A-202 ....................................................................................... 15

Va. Code § 8.3A-420 ................................................................................. 25, 26

Va. Code § 8.4 ................................................................................................. 25

Va. Code § 8.4-104 .......................................................................................... 24

Va. Code § 8.4-207 ............................................................................... 13, 24, 31

Va. Code § 8.4A-102 ....................................................................................... 24

Va. Code § 8.4A-108 ....................................................................................... 24

Va. Code § 8.4A-204(a) ................................................................................... 26

Va. Code § 8.4A-207 .................................................................................. *passim*

Va. Code § 8.4A-207, Official Comment 2 ................................................. 15, 20

Va. Code § 55-4A-207 ..................................................................................... 20

Va. Code § 55-4A-207(b) ................................................................................ 20

## <u>JURISDICTIONAL STATEMENT</u>

This matter is properly before the Court as an appeal from a final order or judgment under 28 U.S.C. § 1291.

The Amended Complaint pled both federal question jurisdiction, 28 U.S.C. § 1331, and diversity jurisdiction under 28 U.S.C. § 1332. After the district court dismissed Plaintiff's claim under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq*., leaving only state-law claims, the matter proceeded under the district court's diversity jurisdiction. Plaintiff Studco Building Systems US, L.L.C. ("Studco") is an entity organized under the laws of the State of New York with its principal place of business in that state. Amended Complaint ¶ 5, JA19. Defendant 1st Advantage Federal Credit Union ("1st Advantage") is a federally-chartered credit union localized in Virginia with its headquarters in the Commonwealth of Virginia. The parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291. A Memorandum and Order was issued by the district court, after a bench trial, on January 12, 2023. JA550. The district court awarded compensatory damages to Studco on two counts ("mis-designation of beneficiary under the UCC" and common-law "bailment"). The district court also invited Studco to file a petition for

costs and attorney's fees. 1st Advantage filed a timely (albeit protective) Notice of Appeal on February 7, 2023. JA586. On February 9, 2023, Studco filed a timely motion under Federal Rule of Civil Procedure 59(e) to alter or amend the judgment to add a punitive damages award at Virginia's statutory limit of $350,000. JA588.

Studco's Rule 59(e) motion to add punitive damages was denied by the district court on July 7, 2023, JA550. Studco filed a Notice of Cross-Appeal on July 21, 2023, JA593, which was timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A). The denial of Studco's Rule 59(e) motion made 1st Advantage's Notice of Appeal effective as of July 7, 2023, pursuant to Federal Rule of Appellate Procedure 4(a)(2). This Court consolidated the appeal and cross-appeal, designating 1st Advantage as appellant, by Order dated July 24, 2023.

Accordingly, the appeal and cross-appeal are from final orders or judgment of the district court, and this Court has jurisdiction to hear them.[1]

## ISSUES PRESENTED FOR REVIEW

This appeal presents primarily two strictly legal issues for review, the correct resolution of each being critically important to the continued viability of the system of electronic funds transfers that makes the modern financial system possible.

---

[1] Plaintiff's petition for an award of costs and attorney's fees remains pending in the district court. No party requested, and the district court did not enter, an order under Federal Rule of Civil Procedure 58(e), so the pendency of that petition does not affect the finality of the orders and judgment which are subject to this appeal.

First, did the district court err by, in essence, substituting a negligence system for the strictures of Uniform Commercial Code Section 4A-207? That provision governs liability when an electronic transfer of funds, such as in this case, is sent to and accepted by a financial institution, but the name and the account number on the transfer do not match. This is termed "mis-designation of beneficiary," and the UCC imposes liability on the accepting institution only when the accepting institution has "actual knowledge," at the time of its acceptance, that the account number and name do not match. Given the millions upon millions of such transactions made daily, the UCC (and the nonbinding rules of a private institution, the National Automated Clearing House Association, or "NACHA") expressly allow the recipient financial institution to rely <u>solely</u> on the account number. Neither the law nor the private rule impose any duty on the recipient financial institution to check, match, or even look at the name on the account. Unless the recipient financial institution had actual knowledge at time of acceptance that there was a mis-match between name and account number, and accepted the deposit despite actually knowing that the name did not match the account number, the recipient financial institution (here, 1st Advantage) is not liable.

Second, did the district court err by imposing liability on 1st Advantage for a breach of a common-law bailment under these same circumstances? Liability under a bailment theory is based on negligence, at least in Virginia, and the varying

standards for negligence in the Commonwealth and in other jurisdictions have been preempted, in the interests of a harmonized national system, by the very provision of the UCC upon which Studco relies in this case. Moreover, it is beyond peradventure that, under Virginia law, a bailment is created only by the entrustment of chattel – a physical object – and that any kind of money deposit in any kind of financial institution does not create a bailment, but rather a generalized debt.

A subsidiary issue is also present. In its uncritical acceptance of the scam e-mail – which, among other things, was signed with a correct e-mail address but which directed responses to the purported sender at a similar, but noticeably different, scam e-mail address – Studco acted negligently. To the extent 1st Advantage's liability in this case is predicated in the slightest degree on its failure to act with due regard, the merest negligence by Studco bars its recovery under Virginia's strict rule of contributory negligence.

## STATEMENT OF THE CASE

This case arises out of an Internet scam in which none of the parties to the case had a role, other than as victim. Appellee Studco, plaintiff below, was scammed by a person or persons unknown five years ago. Studco now seeks to make 1st Advantage bear its loss, since the funds of which it was scammed passed through a 1st Advantage member account on their way to the wrongdoers.

Studco fell victim to an international Internet scam in the fall of 2018 when its e-mail system was infiltrated. Based on an unconfirmed, albeit suspicious, e-mail purporting to be from one of its suppliers, Studco stopped sending remittances for that supplier to the supplier's account at JPMorgan/Chase, and sent them instead to an account at 1st Advantage. JA474-JA476. The scammers had anonymously induced a long-time 1st Advantage member to create the account by "hiring" her to act as a conduit for funds for "real estate" transactions; the funds Studco was tricked into sending to her "real estate" closings account were promptly sent onwards.[2] Despite the involvement of local law enforcement and the Federal Bureau of Investigation, no one has identified the scammers or recovered any of the funds, although an internal report by Studco's information technology provider suggests the attacks on its system originated in places such as the United Arab Emirates, Nigeria, and Dubai. JA458.

Studco is a steel fabricator, whose principal office in the United States is in Webster, New York. Studco does not manufacture its own steel; it purchases steel as a raw material from its suppliers. The supplier involved in this case is Olympic Steel, Inc. After receiving the fraudulent scam e-mail early in October 2018

---

[2] By this time no one contends that this 1st Advantage member was other than an unwitting dupe, and "John Doe" has been dismissed from the case. Depositors in a credit union, which is owned cooperatively, are referred to as "members" rather than as depositors, clients, or customers.

purporting to come from Olympic Steel, Studco directed four Automated Clearing House (ACH) payments intended for Olympic Steel to the member account created at 1st Advantage, totaling $558,868.71.[3] Since the ACH transfers were all made to a properly-numbered existing 1st Advantage account, albeit naming Olympic Steel as the payee, 1st Advantage's system automatically accepted them, without human intervention, as permitted by the UCC.

Studco wants this money back. Studco's Amended Complaint pled that under the UCC, 1st Advantage had actual knowledge that the account numbers and name of the recipient did not match. *See, e.g.*, Am. Comp. ¶ 176, JA37. After discovery revealed that 1st Advantage lacked that actual knowledge, Studco argued at trial, and the court below agreed, that 1st Advantage should nonetheless be deemed to have had "actual knowledge" that the beneficiary of the transfers was "mis-designated" at the time the transfers were accepted, even though it did not in fact have such actual knowledge, because 1st Advantage should have used more rigorous internal procedures.

1st Advantage itself is a relatively modestly-sized, federally-chartered, member-owned, not-for-profit, community-based credit union. Its membership generally is restricted by its federal charter to those living or working in Hampton

---

[3] The timing and amount of the payments were stipulated to at trial.

Roads and northeastern North Carolina. It is subject to regulation and oversight by the National Credit Union Administration ("NCUA"), a federal regulatory agency which performs periodic audits of its systems, usually yearly.

1st Advantage first became aware of the scam when the President of Studco made a cold-call to the main 1st Advantage telephone number on November 21, 2018. Although declining to provide personal and financial information about the member who opened the account, due to federal regulatory concerns, 1st Advantage immediately closed the account; initiated a cooperative investigation under federal law with JP Morgan/Chase and with Bank of America, and provided all of its documentation to the FBI. JA149-JA150, JA330, JA370-372 (testimony Keith Ward, Director of Compliance for 1st Advantage).

Studco filed suit in the Western District of New York against 1st Advantage and its member (naming her as "John Doe") in November 2019. JA3 (docket sheet). Studco filed its Amended Complaint, the operative pleading, on January 29, 2019, JA18. Notwithstanding discussions between the parties and their counsel on a number of occasions during 2019, and notwithstanding its own IT company's report indicating the international origin of the scam, the Amended Complaint accused 1st Advantage itself, together with its "John Doe" member, of having been the scammers -- a racketeering enterprise. Studco pled that 1st Advantage "knew" that the transfers to 1st Advantage were "fraudulent," Am. Compl. ¶ 79, JA27; that

1st Advantage "benefitted from concealing [these] acts," id. ¶ 143, JA34; that 1st Advantage engaged in a "pattern of racketeering activity," id. ¶ 262, JA46, and that Studco lost its money due to 1st Advantage's "racketeering activity." Id. ¶ 268, JA 46.

The Amended Complaint even pled that 1st Advantage and its member originated the scam e-mail – that 1st Advantage acted "in concert and agreement" with its member in sending the original scam e-mail to Studco, Am. Compl. ¶¶ 69-71, JA26, and that 1st Advantage and its member had "tricked Studco into sending [the] wire transfers [to 1st Advantage]," id. ¶¶ 262, 265, JA46 -- and as well that 1st Advantage "knew the transfers [from Studco] were fraudulent, and was required to refuse those transfers but did not." id. ¶ 168, JA37.[4]

On 1st Advantage's motion, the action was transferred from New York to the Eastern District of Virginia in July 2020. JA6 (docket entry). 1st Advantage filed a motion to dismiss all eight of the claims in the Amended Complaint, JA50, which the district court, Hon. Raymond A. Jackson presiding, granted as to five of the claims (including the RICO claim) on December 18, 2020, JA53. The district court dismissed all claims against the "John Doe" member defendant. JA58-JA59.

---

[4] There has never been any evidence that the member (or 1st Advantage) had anything whatsoever to do with sending the scam e-mail; these allegations were improvident.

After resolution of the motion to dismiss, three claims remained against 1st Advantage, all under Virginia law:

- Count One, alleging "mis-designation of beneficiary" under Section 4A-207 of the Uniform Commercial Code, Va. Code § 8.4A-207. JA59.

- Count Three, alleging "bailment" under common law. JA62.

- Count V, alleging "fraudulent concealment" under common law. JA66.[5]

The parties stipulated to a bench trial, JA11 (docket entry 101). The parties filed cross-motions for summary judgment, both of which were denied on May 2, 2022. JA103 (docket entry). The matter was tried to the district court on September 13 and 14, 2022, JA12 (docket entry), and the parties subsequently submitted proposed findings of fact and conclusions of law, JA487 (Defendant's Proposed Findings of Fact and Conclusions of Law); JA513 (Plaintiff's Proposed Findings of Fact and Conclusions of Law).

On January 12, 2023, the district court issued a Memorandum Opinion and Order, JA550, which is the subject of this appeal.

---

[5] "Fraudulent concealment" is not a claim recognized by Virginia law. Rather, it is a doctrine by which the fraudulent concealment of the existence of a claim may, in some circumstances, toll the statute of limitations. Studco pled that the failure of 1st Advantage to provide personal and financial information about its "John Doe" member directly to Studco, before the suit was filed, was actionable (as opposed to barred by federal bank privacy laws, 12 C.F.R. § 1016.10(a)(1)). No matter: the district court held against Studco on this count. JA582-JA583.

## SUMMARY OF ARGUMENT

With respect, the experienced district court judge below made fundamental errors of law which, if uncorrected, stand a significant chance of undermining the highly-automated system of electronic bank transfers that make the modern economy function.

**First**, the district court erred by holding 1st Advantage liable to Studco on a theory of "mis-designation of beneficiary," as set forth in Section 4A-207 of the Uniform Commercial Code. That provision recognizes that, given the myriad electronic transfers among and between banks, credit unions, and other institutions, it is impracticable to provide a detailed examination of each transfer. Transactions may be automated, and essentially all of them are. A recipient financial institution has no obligation to confirm that the name on a deposit conforms to the account number indicated in an electronic deposit, and expressly is permitted to rely <u>solely</u> on the account number in accepting the deposit. The only exception to that rule relevant here is when the recipient financial institution has <u>actual</u> <u>knowledge</u> that a particular deposit account number does not match the account name.

Here, the testimony was unequivocal that 1st Advantage did not have actual knowledge that the ACH transfers initiated by Studco pursuant to the scam – which included the 1st Advantage member's correct account number but the name of Olympic Steel – were "mis-designated" at the time they were accepted. Those

transfers were accepted into the properly-numbered account automatically and without human intervention. While 1st Advantage's automated system – commercially provided by the largest provider of such systems in the nation -- did include a review to see if the name and number matched, that "warning" was activated if there was any discrepancy between the name on the account and the name on the deposit: "John M. Smith" on a deposit would trigger a "warning" if a check payable to "Smith, John M." was presented. These internal warnings, triggered hundreds or thousands of times a day at 1st Advantage alone, were found not to be useful and were not reviewed routinely, although they were captured on an internal data processing system. Other matters flagged by the system, which were termed "exceptions," were intended to catch suspicious transactions; the evidence is undisputed that no "exceptions" were triggered by Studco's four deposits to the member's account.

In holding for Studco on this UCC claim, the district court discussed a number of ways in which 1st Advantage might have modified its commercially-available systems to "catch" a larger number, or wider variety, of suspicious transactions. In so holding, the lower court strayed from the "actual knowledge" standard required by the UCC to the fuzzy realm of negligence. This was error as a matter of law.

And even if the district court was right to import the law of negligence into this statutory claim, the court below erred. To the extent that the district court held

11

1st Advantage liable due to its reliance on a widely-available, widely-used, unaltered commercial program to catch problems – a system which had been used for thirty years or more by 1st Advantage without ever experiencing a similar issue, which was audited as recently as the year before and disclosed no problems, and which was reviewed by its federal regulatory authority – the court committed clear error in holding that 1st Advantage did not act in a commercially-reasonable manner.

**Second,** the district court erred as a matter of law in awarding judgment to Studco on its common-law bailment theory. No bailment existed in this case, for the plain and undeniable reason that Studco never delivered chattel to 1st Advantage to hold. Under Virginia law, a claim of bailment presupposes the delivery of chattel – a thing – to the defendant. A deposit of funds into a bank creates a generalized debt payable by the bank; it does not create a bailment. The case law is clear on this issue.

**Finally,** to the extent that Studco prevails on either the UCC claim or the bailment claim based on an allegation that 1st Advantage did not exercise ordinary care, Virginia's strict adherence to the doctrine of contributory negligence would bar the claim. The district court merely questioned whether Studco's negligence could be a proximate cause of the harm it suffered, and then reiterated its conclusions respecting 1st Advantage's failure to act in a commercially reasonable manner. JA582 (Mem. Op. of Jan. 12, 2023 at 33). Respectfully, this misses the point, and constitutes an error of law. But even if one concedes (which 1st Advantage does not)

that 1ˢᵗ Advantage's system fell short of the standard of care, and that this is the proper standard for evaluating its liability, Studco still may not recover at all if its own negligence caused <u>any</u> part of the losses. And here, Studco's profound negligence bars all recovery.

## ARGUMENT

### Standard of Review

By agreement of the parties, this matter was tried to the district court sitting without a jury. Accordingly, this Court reviews questions of law *de novo*, and conclusions of fact for clear error. *Greenbrier Hotel Corp. v. Unite Here Health*, Nos. 16-2116, 17-1720, 719 F. App'x. 168 (4th Cir. 2018)*; Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 357 (4th Cir. 2014).

**I.      THE DISTRICT COURT COMMITTED AN ERROR OF LAW BY CREATING A NEGLIGENCE STANDARD FOR LIABILITY UNDER VA. CODE § 8.4-207, WHICH IMPOSES LIABILITY ONLY WHERE THE RECEIVING FINANCIAL INSTITUTION HAD "ACTUAL KNOWLEDGE" OF MIS-DESIGNATION OF THE BENEFICIARY AT THE TIME THE TRANSACTION OCCURRED**

The district court erred as a matter of law by importing the equivalent of a negligence standard into Studco's claim for misdescription of beneficiary under Virginia Code Section 8.4A-207. This provision of the Uniform Commercial Code allocates liability in the case where a transfer is made into an account at a financial institution, but the account number does not match the name on the account. The general rule is that unless the receiving financial institution had actual knowledge of

13

the difference at the time the deposit was made – and 1st Advantage did not – the receiving financial institution is not liable. The essence of the lower court's opinion is that 1st Advantage's procedures were not "commercially reasonable" – i.e., did not meet a standard of care and were negligent -- and therefore it could not avoid liability due to its lack of actual knowledge.[6]

At the motion to dismiss stage, the district court correctly described the law:

> [Section 207] provides that if the bank receives a payment order that identifies the beneficiary by name and account number, the bank may rely in the account number even if the number and name identify different persons. . . . For purposes of this statute, "Know" means actual knowledge. . . . To put it another way, a bank may accept a wire transfer relying solely on the number as the proper identification of the beneficiary of the order and it has no duty to determine whether there is a conflict *unless* the bank actually knows that the number and the name identify different accounts. This if the Bank does not know about a conflict between name and number, then it has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary of the order.

---

[6] Section 207, under which Studco brought this claim, addresses only deposit transfers made <u>into</u> an account. It has nothing to do with payments made out of an account. And the relevant time to assess 1st Advantage's knowledge is at the <u>time</u> the deposit is <u>made</u> and accepted; information brought to light after the acceptance of a deposit, or procedures used to vet payments or the opening of an account, or to undertake an investigation related to a payment but not a deposit, have nothing to do with Section 207 and its rule allocating liability.

Mem. Op. and Order of December 18, 2020 at 7-8, JA59-JA60 (citations omitted,

emphasis in original). The Virginia iteration of the UCC distinguishes "notice" from

"knowledge":

> (a)    Subject to subsection (f), a person has "notice" of a
> fact if the person:
> (1)    has actual knowledge of it;
> (2)    has received a notice or notification of it; or
> (3)    from all the facts and circumstances known to the
> person at the time in question, has reason to know that it
> exists.
> (b)    "Knowledge" means actual knowledge. "Knows"
> has a corresponding meaning."

Va. Code Section 8.1A-202. Official Comment 2 to Section 4A-207 explains the

reason why actual knowledge matters:

> A very large percentage of payment orders issued to the
> beneficiary's bank by another bank are processed by
> automated means using machines capable of reading
> orders on standards formats that identify the beneficiary
> by an identifying number of the number of a bank account.
> The processing of the order by the beneficiary's bank and
> the crediting of the beneficiary's account are done by use
> of the identifying or bank account number without human
> reading of the payment order itself. The process is
> comparable to that used in automated payment of checks.
> The standard format, however, may also allow the
> inclusion of the name of the beneficiary and other
> information which can be useful to the beneficiary's bank
> and the beneficiary but which plays no part in the process
> of payment. If the beneficiary's bank has both the account
> number and name of the beneficiary supplied by the
> originator of the funds transfer, it is possible for the
> beneficiary's bank to determine whether the name and
> number refer to the same person, but if a duty to make that
> determination is imposed on the beneficiary's bank the

15

> <u>benefits of automated payment are lost. Manual handling</u>
> <u>of payment orders is both expensive and subject to human</u>
> <u>error.</u> If payment orders can be handled on an automated
> basis there are substantial economies of operation and the
> possibility of clerical error is reduced. Subsection (b)
> allows banks to utilize automated processing, by allowing
> banks to act on the basis of the number without regard to
> the name if the bank does not know that the name and
> number refer to different persons. "Know" is defined in
> section 1-201(25) to mean actual knowledge, and section
> 1-201(27) states rules for determining when an
> organization has knowledge of information received by
> the organization. The time of payment is the pertinent time
> at which knowledge or lack of knowledge must be
> determined. . . . .

Emphasis added. Similarly, the NACHA Rules in effect during 2018 state:

> An RDFI [Receiving Financial Depository Institution]
> may rely solely on the account number contained in an
> Entry for the purpose of posting the Entry to the
> Receiver's account, regardless of whether the name of the
> Receiver in the Entry matches the name associated with
> the account number in the Entry.

At this late date, after the conclusion of the trial, no one still contends that 1st Advantage accepted the four ACH transfers from Studco's sending bank while actually knowing that the account number into which they were deposited did not bear the name of the payee included on the transfer. (The district court denied 1st Advantage's motion to dismiss on this ground, while correctly articulating the law, because the Amended Complaint made repeated albeit false allegations that 1st Advantage had such actual knowledge.) The transfers were made on October 4, October 16, November 5, and November 31. JA175 (testimony of 1st Advantage

compliance manager Keith Ward). The timing and amount of each transfer has been stipulated.

With these principles and dates in mind, what does the evidence show about the systems in place at 1st Advantage in 2018?

Multiple levels of scrutiny were utilized to comply with the UCC and with the Bank Secrecy Act. 1st Advantage vetted transactions against the list of suspicious entities maintained by the Office of Foreign Assets Control ("OFAC"). 1st Advantage also used a system called FCRM – "Financial Crimes Risk Management" – a rule-based system developed and sold by FiServe, an industry leader in protective software for financial institutions, used throughout the industry. JA239 (testimony of Keith Ward). And in addition to that, 1st Advantage used a system called DataSafe to review incoming ACH transfers. JA260 (testimony of Veronica Deans, Deposit Operations Manager for 1st Advantage for 26 years). The systems were used as they were provided, "out of the box," and not modified by 1st Advantage. JA184 (Ward testimony).

Of these systems, an OFAC alert generally triggers a hold and an immediate investigation. The only OFAC alert to occur in this case was on October 26, 2018, when the "John Doe" member sought to make a wire transfer out of the account. The alert was determined to be a false positive – no OFAC-prohibited entity was involved – but because 1st Advantage was concerned that the member did not have

enough information to determine why she was sending the money, 1st Advantage temporarily interrupted her wire transfers. Mr. Ward, as head of risk management, investigated the matter, with a focus on funds that had been sent out of the account. Focusing solely on the sending of international wires, nothing untoward was found. JA174, JA219, JA226, JA227, JA285 (Ward testimony).

The FiServe FCRM system was designed to generate an "exception" when a suspicious transaction occurred. No exceptions ever were generated with respect to the "John Doe" account, either for incoming or outgoing transactions. JA 277 (Deans testimony). In addition, an exception is generated, and manual intervention required, when an incoming ACH or other transfer cannot, for some reason be posted. JA263 (Deans testimony). An exception is not generated if there is simply a mismatch between the name and the account number on an incoming deposit. JA277 (Deans testimony). Studco's expert testified that, although he did not know the parameters of the FCRM system, JA343, it was commercially reasonable and not negligent to use that system. JA344.

Incoming deposits which do not trigger an OFAC warning, or an exception from the Financial Crimes Risk Management system, also go through an automated system called DataSafe. In accordance with the UCC and NACHA rules, ACH deposits that are vetted by DataSafe are automatically handled, without any human intervention, if the deposit is designated for an existing and valid 1st Advantage

account number. DataSafe will note any discrepancy between the name on the payment and the name on the account – "John Smith" as opposed to "Smith, John" – but the deposit will be automatically credited nonetheless. JA260, JA261, JA264 (Deans testimony).

If DataSafe detects any mismatch at all between the name and the account number, it will indicate a "warning" on the file copy of the document respecting the transaction. However, if the account number is valid, the deposit is accepted and the "warning" is placed automatically in "Optical," 1st Advantage's "electronic filing system," so it can be retrieved later if needed. All four of the ACH transfers from Studco triggered a DataSafe warning, but since no exception was ever triggered, no one reviewed the data.

The absence of this review is commonplace, makes sense, and is in accord with the statute and NACHA rules. The system generates, at 1st Advantage alone, hundreds to thousands of warnings every day; 1st Advantage stores them rather than undertaking an individual review "[b]ecause the system generates so many it wouldn't be a benefit to do so." JA276 (Deans testimony). The use of a commercial "CCD" code for a personal account does not generate a warning or exception. JA 280 (Deans testimony). Ms. Deans testified that, were she required to review the hundreds or thousands of "warnings" generated in on a particular day, she "could not even get through the processing in a day." JA285

And the procedure Ms. Deans testified about is precisely what the UCC (and the NACHA rules) contemplate: the receiving financial institution has no duty to determine if the name and account number match, and no duty to make any inquiry. The receiving financial institution is free to rely on the account number alone. That is just what 1st Advantage does.

Studco's claim – a dangerous claim for the automated financial economy -- is that 1st Advantage should have done more than using prominent, commercially-reasonable, widely utilized, unaltered protective software to review its ACH deposits. (At one point, Studco's expert suggested that 1st Advantage should have, internally, reset the FCRM defaults, although he knew of no comparable credit union or other financial institution that had done so.)

The law is clear that the existence of "warnings" internal to the 1st Advantage DataSafe system do not constitute actual knowledge to 1st Advantage. *First Sec. Bank of New Mexico, N.A. v. Pan Am. Bank* , 215 F.3d 1147 (10th Cir. 2000):

> . . . § 55-4A-207(b) was designed with automated wire transfer services in mind. In a fully automated system, computer software identifies the account number on an incoming wire, searches the bank's system for a matching account number, and credits the account if a match is found. Id., Official Comment 2. The efficiency benefits of an automated system are undermined if a bank is not able to rely on its automated system but must independently verify there is no conflict between a beneficiary name and an account number. Thus, the drafters of § 55-4A-207

clarified that although it is possible for the beneficiary's bank to determine whether the name and number refer to the same person, it "has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary of the order." Id. Significantly, the statute "is not limited to cases in which processing is done by automated means. A bank that processes by semi-automated means or even manually may rely on number as stated in Section 4A-207." Id.

Although a bank has no duty to affirmatively search for conflicts between beneficiary names and account numbers of incoming wires, it may not escape liability if, before it pays the wire, it gains knowledge of the conflict by any means but nonetheless pays an individual who is not entitled to receive the funds. "Knowledge" means actual knowledge, not constructive knowledge, and is determined at the time of payment. Id.

215 F.3d at 1152-53 (emphasis added).

1st Advantage had no actual knowledge of the mis-designation at the time it accepted the deposits. It is not liable to Studco under Section 207.

## II. THE DISTRICT COURT COMMITTED AN ERROR OF LAW BY IMPOSING LIABILITY ON 1ST ADVANTAGE UNDER A COMMON-LAW "BAILMENT" THEORY

### A. Under Virginia Law, Creation of a Bailment Requires the Entrustment of Chattel; Electronic or Other Deposit of Funds in a Financial Institution Cannot Create a Bailment as a Matter of Law

The district court erred as a matter of law when it determined that an electronic deposit of funds into a financial institution created a bailment. Under Virginia law, a bailment is created only by the transfer of <u>chattel</u>. "A bailment has been broadly defined as 'the rightful possession of <u>goods</u> by one who is not the owner.'"

*K-B Corp. v. Gallagher*, 218 Va. 381, 384 (1977) (quoting 9 S. Williston, Contracts 875 (3d ed. 1967)) (emphasis added). "[F]or a bailment to arise there must be a delivery of the <u>chattel</u> by the bailor. . . ." *K–B Corp.,* 218 Va. at 384 (citing *Crandall v. Woodard*, 206 Va. 321, 327 (1965)) (emphasis added). *See, e.g., Evans v. Charles Barker Infiniti, Inc.,* No. 011858, at 2, 2002 WL 32784253, (Va. June 7, 2002) ("a bailment is created when a chattel is lawfully delivered by or with the permission of its owner") (delivery of automobile)*; Aufforth v. Aufforth*, 72 Va. App. 617, 627 (2020) (bailment involves personal property); *Daughtry v. Gray's Body Shop, Inc.,* 82 Va. Cir. 366 (Norfolk 2011) (same); *Auto. Serv. Fin., Inc. v. Affordable Towing, Inc*. 71 Va. Cir. 15 (Va. Beach 2006) ("a bailment is created when a chattel is lawfully delivered by or with the permission of its owner").

On the other hand, under Virginia law, a "general deposit in a bank is 'not a bailment.'" *Gardner v. Commonwealth*, 262 Va. 18, 21 (2001), citing *Pendleton v. Commonwealth,* 110 Va. 229, 234 (1909). Generally the transfer of funds into a financial institution creates only a general debt of the financial institution until the money is paid out. *Bernardini v. Cent. Nat'l Bank*, 223 Va. 519, 521 (1982) ("the relation between a general depositor and the bank in which his deposit is made is simply that of debtor and creditor. The moneys deposited immediately become the property of the bank, and the latter becomes debtor of the depositor. . ."), (quoting *Reserve Bank v. State Bank*, 150 Va. 423, 430-31(1928)).

In this case, no bailment was created because no chattel was delivered. Every case cited by Studco, every case cited by the district court in its decision denying 1ˢᵗ Advantage's motion to dismiss in 2020, and every case cited in the district court's 2023 Memorandum and Order involved the transfer of chattel, not the deposit of funds. *See* Mem. Op. and Order of Dec. 18, 2020, at JA62 – JA63 (cases referring to "possession of goods," "a delivery of the chattel," "duty to account for the thing," "control over the goods," "guest at party who picks up watch," "employee to furnish his own tools."); Mem. Op. and Order of Jan. 12, 2023, at JA574 (same). Indeed, the one case relied upon by Studco, *First State Bank of Monroe v. Connoley*, 131 Va. 479 (1921), involved entrustment of a physical package containing cash, not a transfer or deposit of funds. Id. at 481 ("Thereupon Connoley took the draft on to Lynchburg himself, went to the bank, got the money, done up in a package, and put it in his inside coat pocket").

No chattel – no physical thing – ever was entrusted to 1ˢᵗ Advantage, by Studco or anyone else. It was an error of law for the district court to find that a bailment was created here, and to impose liability on 1ˢᵗ Advantage on that basis.

**B.      The Provisions of the Uniform Commercial Code, Va. Code § 8.4-207, Preempt any Virginia Common Law Cause of Action of Bailment Based on the Same Facts**

Count One of its Amended Complaint contains Studco's exclusive remedy. Article 8.4A of the Virginia iteration of the UCC, titled "Uniform Commercial Code – Funds Transfers," sets forth the exclusive rights, remedies, and procedures for electronic funds transfers. "Except as otherwise  provided in § 8.4A-108 [the federal Electronic Funds Transfer Act, not pertinent here], this title applies to funds transfers defined in § 8.4-104." Va. Code § 8.4A-102. Section 104, in turn, defines "funds transfer" and other terms, including terms specifically applicable to Studco's claim under Section 207 respecting the misidentification of a beneficiary.

Article 8.4A was adopted expressly to prevent the use of other state-level and common-law principles to govern these financial transactions. The Official Comment to § 8.4A-102 as adopted by Virginia states:

> In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment.
>
> \* \* \* \* \*
>
> Funds transfers involve competing interests – those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of these interests and are intended to be the <u>exclusive</u> means of

> determining the rights, duties, and liabilities of the affected parties in any situation  covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

(Emphasis added.)

It is well-settled that the availability of a claim addressed by the Uniform Commercial Code pre-empts any analogous common law claim. *Equitable Life Assurance Soc. of the U.S. v. Okey*,  812 F.2d 906, 908 (4th Cir. 1987) (common-law claim for conversion "displaced" by UCC coverage) (South Carolina law). *See, e.g.*, *Nirav Ingredients, Inc. v. Wells Fargo Bank, N.A.*, No. 21-1983, 2022 WL 3334626 (4th Cir. Aug. 12, 2022) (UCC Article 4A, incorporated into Federal Reserve Board Regulation J, preempts state law on negligence claim arising out of misidentification of beneficiary); *Wallace ex rel. DMT, LLC v. Truist Bank*, No. 21-2380 at 4, 2022 WL 2452355 at *1 (4th Cir. July 6, 2022) ("Title 8.4  of  Virginia's UCC 'establishes the rights and duties between banks and their customers with regard to deposits and collections.' The UCC preempts any common law claims inconsistent with its provisions.") (citations omitted); *Stefano v. First Union Nat'l Bank of Va.,* 981 F. Supp. 417, 420 (E.D. Va. 1997) (Ellis, J.) ("Virginia Code § 8.3A-420 . . . clearly encompasses the instant dispute and provides plaintiff with a remedy for the alleged wrong. . .Because § 8.3A-420 fits these facts, it follows by

operation of § 8.1-103 that § 8.3A-420 displaces the common law and is plaintiff's

exclusive remedy.").

The Virginia Supreme Court has addressed the issue a number of times. In

*Schlegel v. Bank of America, N.A.*, 271 Va. 542 (2006), that Court evaluated a

common-law claim asserting:

> alleged unauthorized payment orders [which were] sent to
> the Bank. The provisions of Code § 8.4A–204(a) address
> a receiving bank's liability if it accepts a payment order
> that is not authorized and not effective as the order of the
> customer. The alleged unauthorized payment orders are a
> "situation covered by the particular provisions" of Code §
> 8.4A–204(a) and the remedy [plaintiff] seeks in his
> common law claims would conflict with the statutory
> remedy. [Citations omitted.]    In other words, to allow
> [plaintiff] to proceed on his common law claims with
> regard to the unauthorized payment orders would "create
> rights, duties and liabilities inconsistent with those stated
> in" Code § 8.4A–204(a). [Multiple citations omitted.].
> Therefore, his common law claims as they relate to the
> alleged unauthorized payment orders are preempted by the
> provisions of Code § 8.4A–204(a).

Id. at 553. *See, e.g., Collins v. First Union Nat'l Bank*, 272 Va. 744, 749-50 (2006)

("The principles of contract law that formerly regulated the relationships between a

bank and its customers have been generally displaced by the Uniform Commercial

Code with respect to any situation covered by particular provisions of Article 4 of

the U.C.C.").

Studco's claim for bailment is preempted by the principles of the Uniform

Commercial Code, the very section upon which Studco predicates its claim of mis-

designation of beneficiary. It was error for the district court to hold that the common law of bailment applied in this case.

## III. TO THE EXTENT ANY LIABILITY IMPOSED ON 1ST ADVANTAGE RESTS ON A CONCLUSION THE DEFENDANT FAILED TO EXERCISE REASONABLE CARE, THE DISTRICT COURT COMMITTED LEGAL ERROR IN NOT FINDING RECOVERY BARRED BY THE DOCTRINE OF CONTRIBUTORY NEGLIGENCE

Virginia is a contributory negligence, not comparative negligence, jurisdiction. Any degree of contributory negligence, by a plaintiff, when proven, is an absolute bar to recovery on a claim predicated on the defendant's failure to exercise reasonable care. *AlBritton v. Commonwealth*, 299 Va. 392, 411 (2021); *Smith v. Va. Elec. & Power Co.,* 204 Va. 128, 133 (1963). The district court's judgment in favor of Studco on its bailment claim must, as a necessity, be predicated on negligence; in the absence of negligence there is no bailment claim. And the district court's decision in favor of Studco on its UCC claim is not predicated on the actual knowledge of 1st Advantage at the time the deposits were received, but rather on the failure of 1st Advantage to act in a commercially reasonable manner to obtain that knowledge – the essence of negligence.

The district court held its conclusion, that 1st Advantage did not act in a commercially-reasonable way that made any negligence on the part of Studco irrelevant. The district court reasoned that any negligence by Studco in falling for

the spoofed e-mail did not relieve 1st Advantage from its obligation to act in a commercially-reasonable manner. Mem. Op. and Order of Jan. 12, 2023, JA582.

With respect, that entirely misconceives the notion of contributory negligence. The defense of contributory negligence assumes that the defendant did not act properly, assumes that the defendant acted negligently, assumes that the defendant did not act in a commercially-reasonable manner. That is just the point. In Virginia, even assuming a defendant acted unreasonably, if the plaintiff's own lack of care was a proximate cause of the injury, the plaintiff may not recover.[7] Here, if Studco had exercised just a modicum of care at the outset – calling to confirm, sending a modest test wire, using their regular e-mail address for Olympic, even checking to see if the first or second or third six-figure payment had arrived -- this case would never have existed.

To begin with, the scammers obtained access to Studco's system by hacking into its Office 365 account, watching its e-mail. JA117 (testimony of Studco CEO Benjamin Stevens). Studco's system originally came with two-factor authentication, but it failed during an outage and Studco never bothered to fix it. JA141 (testimony of Studco CEO Benjamin Stevens).

---

[7]     It does not appear that the district court made a finding, either way, as to the negligence of Studco. 1st Advantage submits that the evidence is pellucid: no reasonable company would have fallen for the rather amateurish scam e-mail that induced Studco to change its payment practices.

The scam e-mail that Studco fell for was not sophisticated. The e-mail itself is found at JA475, part of Plaintiff's Exhibit 32. It purports to come from William Georger, Olympic Steel's account relationship manager for Studco. The e-mail contains odd phrasing ("all payment should be remitted"). It inquires whether the addressee is "the right person to send the new instructions to," even though Olympic Steel has been doing business with Studco for over nine years (JA105, direct examination of Studco CEO Benjamin Stevens), and Mr. Georger regularly visited the Studco facilities, perhaps every two or three months. *Id*. The punctuation is notably off (three of the five sentences end with a comma rather than a period).[8]

Most notably, the signature block on the e-mail fails to match the e-mail address from which the e-mail was sent. The signature block for Mr. Georger bears his correct ".com" e-mail address, the one which Studco had been using for years.

---

[8] An earlier, genuine e-mail from Olympic Steel, asking to change its bank to Bank of America, existed, dated September 1, 2018. At trial, Studco CEO testified that this e-mail was received on October 4, but he was inconsistent and noted he did not see the e-mail until produced by Olympic Steel in discovery. JA136-JA140. At his deposition, testifying under Federal Rule of Civil Procedure 36 as the corporate representative, Mr. Stevens testified that receiving that September 1, 2018, genuine e-mail and having it sit in an in-box at Studco for three weeks "wouldn't be abnormal in the person responsible for AR and AP because they're dealing with the day-to-day whirlwind." JA140. There is no plain evidence that the September 1 genuine e-mail was not received somewhere in Studco before the scam e-mail. *See* JA136 ll. 13-19; JA137-JA138 (could have sat in in box for a couple of days and then been altered); *id.* (discussing Pl.'s Ex. 16, JA461-461, dated October 4, 2018, internal, and attaching genuine September 1, 2018 e-mail from Olympic Steel changing banking information to Bank of America).

But the e-mail <u>came</u> from a ".net" address created by the scammers. The e-mail also copied Olympic Steel's (false) "corporate.ar" at the new, different, and false ".net" address. But when Studco responded, JA474, it took no notice of the errors and discrepancies, and simply "replied" to the scammers at the false ".net" mail address. In replying to Studco, the scammers once again sent the e-mail from the false ".net" address, while <u>again</u> using the accurate and different ".com" address in the signature block. Anyone handling the electronic transfer of funds would have – should have – noticed the discrepancy between the real e-mail address included in the body of the communications, and the fake e-mail address from which it was sent. No one who has any familiarity with e-mail or the Internet would have failed to note the discrepancy, particularly with a half-million dollars or more at stake. Studco should have invested in a telephone call to Olympic Steel.

There are other discrepancies: the telephone number for Mr. Georger in the e-mails uses a "716" area code (Buffalo and Western New York), while his confirming remittance document to Studco, JA476, uses a (203) area code and an address in Milford, Connecticut (and appears to have a cut-and-paste job heading). JA476. No one questioned why a nationwide steel manufacturer would change its bank from JPMorgan/Chase to a modest community-based credit union in Hampton Roads, where Olympic could not be a member.

## CONCLUSION

Appellant 1st Advantage Federal Credit Union respectfully requests that this Court reverse the determination of the district court embodied in its Memorandum Opinion and Order of January 12, 2023, JA550, and enter judgment for 1st Advantage on Appellee Studco's (i) claim for violation of Virginia Code § 8.4-207 and (ii) its claim based on a common-law bailment. That determination would moot Studco's cross-appeal, and also would moot the still-pending application filed by Studco in the district court to be awarded its costs and attorney's fees incurred.

Respectfully submitted,

*/s/ Adam B. Pratt*

JOHN M. BREDEHOFT
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
P. O. Box 3037
Norfolk, Virginia 23514
(757) 624-3000
jmbredehoft@kaufcan.com

ADAM B. PRATT
KAUFMAN & CANOLES, P.C.
4801 Courthouse Street, Suite 300
P. O. Box 6000
Williamsburg, Virginia 23188
(757) 259-3800
abpratt@kaufcan.com

*Attorneys for Defendant-Appellant*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

**No.** 23-1148        **Caption:** Studco Building Systems US, LLC v. 1st Advantage Fed

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains _____7,717_____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
MS Word _____ [*identify word processing program*] in
Times New Roman, 14 point _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Adam B. Pratt _____

Party Name appellant _____

Dated: 10/10/2023 _____